J-A27005-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LYSTN, LLC, INTEGRATIVE GREEN SOLUTIONS, INC., FOOD FOR LIFE TRUCKING AND LOGISTICS CO., BIODYNAMIC FARMS, LLC | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| | : | No. 116 MDA 2023 |
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL (DECEASED), INITIAL, LLC, CONSTANZIA LEVITSKY, AND COCOVINNA, LLC | : : : : : : : : : | |
| APPEAL OF: ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL (DECEASED), AND INITIAL, LLC | : : : : : | |

Appeal from the Judgment Entered February 6, 2023,
In the Court of Common Pleas of Berks County Civil Division at No(s):
21-12980

| | | |
|---|---|---|
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL, DECEASED | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : : | |
| LYSTN, LLC, FOOD FOR LIFE TRUCKING AND LOGISTICS COMPANY, INTEGRATIVE GREEN SOLUTIONS, INCORPORATED, AND BIODYNAMIC FARMS, LLC | : : : : : : | No. 1058 MDA 2023 |
| Appellants | : : | |

Appeal from the Judgment Entered February 6, 2023,

In the Court of Common Pleas of Berks County Civil Division at No(s):
21-12980

| | | |
|---|---|---|
| LYSTN, LLC, INTEGRATIVE GREEN SOLUTIONS, INC., FOOD FOR LIFE TRUCKING AND LOGISTICS CO., BIODYNAMIC FARMS, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | No. 1385 MDA 2023 |
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL (DECEASED), INITIAL, LLC, CONSTANZIA LEVITSKY, AND COCOVINNA, LLC | : | |
| Appellants | : | |
| APPEAL OF: ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL (DECEASED), INITIAL, LLC | : | |

Appeal from the Judgment Entered February 6, 2023,
In the Court of Common Pleas of Berks County Civil Division at No(s):
21-12980

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.:     **FILED: JULY 7, 2025**

Roxanne Stone, individually and as executrix of the will of Jacqueline Hill, deceased, and Initial, LLC (collectively, Appellants), appeal from the judgment, entered in the Court of Common Pleas of Berks County, following the court's orders granting a permanent injunction and granting, in part, and

- 2 -

denying, in part, the parties' post-trial motions.[1]  After careful review, we affirm.

In 2009, Stone and the now-deceased Jacqueline Hill co-founded Appellee Lystn, LLC (Lystn),[2] a Delaware company that develops, formulates, manufactures, sells, and distributes fermented raw pet food—in particular, its proprietary pet food, ANSWERS.  Stone and Hill developed unique processes for inoculation and natural preservation of Lystn's raw pet food products.  As the trial court noted, "Stone [and] Hill—both founding members, shareholders, executives, and/or employees of the Lystn Companies[3]—

---

[1] Although Appellants appealed from the trial court's orders granting a permanent injunction and ruling on the parties' post-trial motions, the appeal properly lies from the final judgment.  **See Keystone Dedicated Logistics, Inc. v. JGB Enters., Inc.**, 77 A.3d 1 at *2 n.1 (Pa. Super. 2013) (although appeal from order disposing of post-trial motions is interlocutory, "[o]nce [] judgment is entered . . .  an appellate court's jurisdiction is perfected [] even [if] the appeal was filed prior to the entry of judgment"); **id.** ("it is clear that jurisdiction in appellate courts may be perfected after an appeal notice has been filed upon the docketing of a final judgment").  **See also** Pa.R.A.P. 905(a)(5) (notice of appeal filed after announcement of determination but before entry of appealable order "shall be treated as filed after such entry and on the day thereof").  On February 3, 2023, Lystn praeciped to enter judgment on the molded verdict.  Judgment was entered on the verdict on February 6, 2023; thus, our appellate jurisdiction has been perfected.  We have directed our Prothonotary to change the caption to reflect that the appeal is correctly taken from the judgment.

[2] Hill passed away in September 2022.

[3] Appellees, Biodynamic Farms, LLC, Integrative Green Solutions, Inc., and Food for Life Trucking and Logistics Company, Inc., are all controlled by Lystn or under common control by Lystn (collectively, Lystn Companies/Lystn-affiliated companies).

- 3 -

developed processes for the natural preservation of the Lystn Companies' raw pet food products using whey fermentation as a means of "'competitive inhibition.'" Trial Court Opinion, 10/12/23, at 3.[4] Food for Life Trucking and Logistics Company (F4L), Integrative Green Solutions, Inc. (IGSI), and Biodynamic Farms, LLC (Biodynamic) (collectively, Lystn-affiliated companies) are all controlled by Lystn or under common control by Lystn. In August 2009, Stone was hired as an independent consultant for Lystn, and, later, became a Lystn employee.

In April 2010, Stone and Hill executed an LLC Operating Agreement (Agreement)[5] for Lystn that designated "Class I Members" and "Class II Members"[6] who "may, notwithstanding this [A]greement, engage in whatever activities they choose, provided the same are not competitive with [Lystn]"

---

[4] In particular, the "whey-fermentation process" included the introduction of a specific type of "good" bacteria that competed to proliferate and, ultimately, outpace "bad" pathogenic bacteria (i.e., salmonella and E. coli), commonly found in raw pet food. Although fermentation had been in use for centuries as a means to preserve foods, the *whey* fermentation process was unique to the pet food industry at the time it was devised by Stone and Hill.

[5] The Agreement was the governing document for Biodynamic's business affairs.

[6] Class I members were permitted to make capital contributions "both in cash and in the form of an assignment of intellectual property, business and industry contacts, and goodwill," actively participate in the operation of the company's business, and receive compensation and benefits. *Id.* at ¶ 12. Class II members, on the other hand, were not entitled to make capital contributions other than in cash or participate actively in the operation of the company's business or receive compensation or benefits. *Id.*

and who were also permitted to serve a "transfer notice" if they wished to resign and transfer their membership interest to another member. **See** Complaint (21-11790), 7/21/21, at ¶¶ 11-13, 72.[7]

In November 2016, Stone and Hill entered into the Integrative Agreement which purported to govern the business affairs of Integrative, an S-Corporation that held certain real property used in Answers' business operations. The Integrative Agreement contains a covenant of confidentiality similar to that contained in the Agreement.[8]

In February 2021, Stone and Hill gave a transfer notice to four other Lystn members and to Lystn's corporate counsel. **Id.** at ¶ 16. In the notice, Stone and Hill stated that they wanted to transfer their member interests in Lystn and resign as a managing member and employee, respectively. **Id.** at ¶ 17. Under the Agreement, once a transfer notice has been received, Lystn and the transfer-member "shall negotiate in good faith to determine the purchase price for the [transfer-member's] membership interest."

_____

[7] In November 2016, Stone and Hill entered into a Shareholder's Agreement for Integrative (Integrative Agreement), which governed the business affairs of Integrative, an "S-Corporation." The Integrative Agreement included a covenant of confidentiality that survives termination of status as either a Lystn-affiliated company shareholder or employee of Integrative. **See** Integrative Agreement, 11/20/26, at Article 6.1.

[8] While the Agreement was interpreted, construed, and enforced under Delaware law, the Integrative Agreement was construed, enforced, and interpreted under the laws of the Commonwealth of Pennsylvania.

Agreement, 4/12/10, at ¶ 7.7.1.[9]  On March 1, 2021, Stone and Hill requested copies of the Lystn-affiliated companies' articles of incorporation, bylaws, operating agreements, shareholders' agreements, employment agreements, and documents reflecting the companies' capitalizations and ownership.

On March 5, 2021, invoking the "Buyout Provision" under the Agreement, the Lystn members voted for Lystn to exercise a purchase option for Stone's and Hill's membership interests.  Following an April 7, 2021 meeting, Lystn members and shareholders agreed to suspend indefinitely the deadline to purchase Stone's and Hill's member interests and shares so that the company could pursue a purchase.  On April 26, 2021, Stone and Hill resigned from Lystn and all of its affiliated companies, while explicitly retaining their respective ownership interests in the companies.  Stone and Hill publicly announced their resignation from Lystn on May 4, 2021.

In May 2021, Stone and Hill organized Appellant Initial, LLC (Initial), a direct competitor of Lystn that operates under the name "Kure Pet Food (Kure)."[10]  Stone and Hill were members of Initial.  Initial is a collective of five Amish farmers—Steven Fisher, Jesse Ervin King, David Esh, John King, and Samuel Stoltzfus (collectively, Amish Farmers)—who each operate through their own companies, Ultra Design (Fisher), Rocky Ridge Goat Dairy (Jesse

---

[9] In the Agreement, Stone and Hill were classified as Class I members with 22% and 12% ownership interest in Lystn, respectively.  **See** Limited Liability Company Agreement, 4/12/10, at ¶ 3.2.

[10] The Kure/Initial venture eventually led to the creation of Solutions Pet Food Products (Solutions).

Ervin King), and Lykens Valley Creamery (Esh/John King/Stoltzfus). The Amish Farmers were all former long-time suppliers of the Lystn-affiliated companies. The Lystn-affiliated companies alleged that Initial manufactured Kure's products using the same formulas and processes—involving proprietary and confidential business information—developed by Stone and Hill while they were working for Lystn.

In July 2021, Stone and Hill sued Appellees (First Action) alleging, among other things, that Appellees breached their shareholder agreement by failing to purchase their respective membership interests under the Agreement's relevant buyout provisions[11] and also seeking declaratory and injunctive relief based on their argument that any non-compete clause in the parties' employment agreement was not enforceable as a matter of law as applied to its members who were not employed by the LLC and did not participate in its management.[12] On August 19, 2021, Lystn and the Lystn-affiliated companies filed a separate action at 21-12980 (Second Action) against Stone and Hill seeking money damages and equitable relief. On the

_____

[11] Lystn alleged that it would be nearly impossible to obtain an accurate valuation of the company that would meet professional standards as of March 2021 due to the state of the company that, since May 2021, had financials "showing an ongoing, escalating, and catastrophic decline in revenue [that] directly correlates [to] Hill and [] Stone's departure [and] the advent of Kure[.]" **See** Trial Court's Findings of Fact, Discussion, and Conclusions of Law in Support of Granting Special Injunctive Relief, 11/5/21, at 48-49, 62.

[12] In their later-filed petition for preliminary injunction, Appellants "request[ed] an injunction on the ground that the Non-Compete Provision in the Operating Agreement is inapplicable, unenforceable, or both." Plaintiffs' Petition for Preliminary Injunction, 8/25/21, at 2.

same date, Lystn filed a petition for special and injunctive relief seeking to enjoin Initial from manufacturing, distributing, and/or selling raw and/or fermented pet food products that competed with Lystn's products and also seeking to prohibit Stone and Hill from consulting with Initial or any other raw pet food company. The complaint in the Second Action alleged various statutory and common law claims arising from misappropriation of Lystn's trade secrets, tortious interference with contractual relations, and breaches of non-compete obligations arising from the formation of Kure while Stone and Hill were members and/or shareholders of Lystn.[13] The Second Action also sought money damages and equitable relief against Initial, alleging that Initial was a direct competitor with Lystn, for "actions taken in conjunction with [the other defendants named in the complaint]." Complaint in Second Action (12980), 8/19/21, at 2.[14]

On September 28, 2021, the Lystn Parties filed a motion asking the court to immediately issue an interim special injunction prohibiting Appellants from selling their products, directing them to immediately recall any of their products that had already been shipped to or delivered to distributors or retailers, and make Initial account for and establish an injunction bond

---

[13] The Second Action also sought money damages and equitable relief against Defendants, Constanzia Levitsky (Coco) and Cocovinna, LLC, for damages they caused through their relationship with Stone and Hill as an independent contractor working for Stone and Hill. *See* Complaint in Second Action (12980), 8/19/21, at 2.

[14] On September 24, 2021, the Lystn Parties filed an amended complaint.

whereby Initial would pay into court "all gross sales proceeds from the sale of its products . . . pending the outcome of [the preliminary injunction proceedings]." **See** Motion for Interim Injunctive Relief, 9/28/21, at 4 (unpaginated). Following twelve non-consecutive days of hearings spanning more than six weeks, the trial court entered an order on October 21, 2021, granting the Lystn Parties' petition for special and preliminary injunctive relief.[15]

_____

[15] The order states, in full:

> (1) The Lystn Parties' Petition for Special and Preliminary Injunctive Relief is **GRANTED**, as follows:
>
> (a) Within seven days of the date of this Order, [Stone, Hill,] and Initial shall identify and provide to counsel for the Lystn Parties the following information in their possession or in the possession of any of their agents, employees, or consultants:
>
> (i) All log-in credentials, passwords, and/or such other information required to access computer-based and cloud-based data and social media accounts owned by, and/or used in the business operations of any of the Lystn Parties;
>
> (ii) Any materials, whether in digital or hardcopy format, relating to marketing, sales, promotions, pricing, and/or branding, developed for, owned by, and/or used in the business operations of, any of the Lystn Parties;
>
> (iii) Any distributor lists, supplier/sub-supplier lists, retailer lists, and/or other customer lists created by the Lystn Companies or any agents, employees, or consultants thereof;
>
> (iv) Any product formulations, processes, standard operating procedures, and/or food safety plans developed by the Lystn Companies or any agents, employees, or consultants thereof for products manufactured by any of the Lystn Companies; and

*(Footnote Continued Next Page)*

_____

(v) All intellectual property, confidential and non-confidential business communications, trademarks, service marks, [and] copyrighted materials owned by, and/or used in the business operations of any of the Lystn Parties.

(b) Pending a final hearing, or until further of this Court, [Stone and Hill] are enjoined and prohibited from:

(i) Providing consulting services to Initial or any other business relating to the manufacture, distribution, and/or sale of raw and/or fermented pet food products competitive to those sold by the Lystn Companies, including raw fermented goat's milk, raw fermented meat products, raw kefir, fermented bone broths and stocks, fermented tea/kombucha, and/or raw cheese, intended for animal consumption;

(ii) Possessing an ownership interest in, or consulting with/for, any business engaged in the development or use of whey fermentation and/or whey intervention as a means of pathogen inhibition in manufactured food products for pet or human consumption;

(c) Pending a final hearing on the merits, or until further [order] of this Court, Initial is enjoined and prohibited from manufacturing, distributing, and/or selling raw and/or fermented pet food products competitive to those sold by the Lystn Companies, including raw fermented goat's milk, raw fermented meat products, raw kefir, fermented bone broths and stocks, fermented tea/kombucha, and/or raw cheese, intended for animal consumption;

(d) [Stone and Hill] and Initial shall hold in strict confidence any and all information regarding product formulations, processes, and/or standard operating procedures for products manufactured by any of the Lystn Companies;

(e) Nothing in this Order shall be deemed to prohibit [Stone, Hill,] and Initial, or its individual members from pursuing employment, consulting, or business opportunities in other areas of the pet or human food industries so long as they do not relate to the raw and/or fermented pet food products competitive to those sold by the Lystn Companies; and

*(Footnote Continued Next Page)*

On October 21, 2021, the trial court entered a preliminary injunction against Appellants which they immediately appealed to this Court. ***See Stone v. Lystn, LLC, et al.***, 1402 MDA 2021, 1403 MDA 2021, 1254 MDA 2021, & 1255 MDA 2021 (the Preliminary Injunction appeals). After the court entered the preliminary injunction, Appellees posted $500,000.00 in cash in lieu of an injunction bond.[16] ***See*** Pa.R.C.P. 1531(b).[17]

_____

(2) Within ten days of the date of this Order, the Lystn Companies shall file a bond or deposit legal tender with the Prothonotary in the amount of $500,000.00, in accordance with Pa.R.C.P. 1531(b).

(3) [Stone and Hill's] Petition for Preliminary Injunction is **DENIED**.

Order, 10/21/21, at 1-2.

[16] Our Court entered a stay of the preliminary injunction; following the vacation of that stay, the injunction again became effective on November 10, 2021.

[17] On August 16, 2022, the court entered a preliminary injunction enjoining Stone and Hill from providing consulting services to Initial or any other business relating to the manufacture, distribution, and/or sale of raw and/or fermented pet food products competitive to those sold by Lystn. ***See*** Order, 8/16/22, at 2. Appellants were also ordered to turn over to Lystn's counsel any of the following in their possession, within seven days: log-in credentials, passwords, and/or other information used to access computer data or the business operations of Lystn; any marketing, sales[,] and promotional materials developed by or owned by Lystn; any distributor or supplier/retailer/customer lists created by Lystn; any product formulations, processes, standard operating procedures, and/or food safety plans of Lystn; and all intellectual property, confidential and non-confidential business communications, trademarks, [and] copyrighted materials owned by Lystn. ***Id.*** at 2. The order permitted Appellants to pursue employment, consulting, or business opportunities in other areas of the pet food industry that did not compete with Lystn's raw and/or fermented pet food products. ***Id.*** at 3.

Following trial, the jury returned a verdict on August 16, 2022, determining that Stone and Hill "intentionally interfered with Lystn's actual or prospective contractual relations with its employees, contractors, suppliers and/or distributors," and assessed damages for Stone and Hill's conduct in the amount of $1,900,000.00. **See** Verdict Slip, at 4. In particular, the jury found that Stone and Hill misappropriated Appellees' trade-secreted formulas in violation of the Pennsylvania Uniform Trade Secrets Act (PUTSA)[18] and that Stone and Hill had also breached covenants contained within their respective shareholder agreements with Appellees. However, the jury also found that the Lystn-affiliated companies breached their obligation to buy out Stone's and Hill's member interests and shares under the operating agreements. **Id.** at 5. As a result of the Lystn breach, the jury assessed damages in the amount of $719,000.00 (Stone) and $1.371 million (Hill), for a total of $2,090,000.00. **Id.**

On August 22, 2022, Appellants and Appellees timely filed post-trial motions. **See** Pa.R.C.P. 227.1(c)(1). In their motion, Appellants argued that they were entitled to a judgment notwithstanding the verdict (JNOV) on the PUTSA claims, that the evidence on damages was insufficient as matter of law, and that Appellees are entitled to nominal damages, at best, on the PUTSA claims. Stone and Hill further claimed that they were entitled to JNOV on the non-competition clause and intentional interference with contractual relations

_____

[18] 12 Pa.C.S.A. § 5301, *et seq*.

claims and that they were entitled to have the verdict molded to include pre-judgment interest, at the legal rate of interest of 6% per year, from the point in time that Appellees unlawfully withheld payment. *See* 41 P.S. § 202. In total, Stone and Hill argued they were entitled to $178,068.00 ($61,258.80 for Stone and $116,809.20 for Hill) in pre-judgment interest. Appellants claimed that they were entitled to a multiplier of 1.42 for one year and five months—representing the time period between April 4, 2021 (proposed date Lystn breached buyout after 30-day window to negotiate expired following March 5, 2021 exercise of purchase option) and September 4, 2022 (date of final judgment). Stone and Hill also sought post-judgment interest. In the alternative, Appellants sought a new trial.

In their post-trial motion, Appellees sought entry of a permanent injunction, based on the restrictions provided in the preliminary injunction, due to the jury's finding that Appellants misappropriated Lystn's pet food formulas. Appellees also sought an order refunding the $500,000.00 cash deposit it made in lieu of an injunction bond. Finally, Appellees moved for exemplary damages and attorneys' fees pursuant to the PUTSA. *See* 12 Pa.C.S.A. § 5304 (court may award exemplary damages in amount not to exceed $600,000.00, in amount not exceeding twice any award made under subsection (a), "if willful and malicious appropriation exists"); *id.* at § 5305 (court may award attorneys' fees, expenses, and costs to prevailing party if "willful and malicious appropriation exists"). In their post-trial motion, Appellees estimated they expended a total of $711,329.73 in legal fees and

costs to pursue and defend the instant matter, "exclusive of any expert fees and representation unrelated to litigation [and] exclusive of time marked as courtesy." Appellees' Post-Trial Motion, 8/22/22, at ¶ 19.

On December 12, 2022, the trial court entered an order granting a permanent injunction against Appellants. On the following day, December 13, 2022, after hearing argument,[19] the trial court issued an order disposing of the parties' competing post-trial motions. The order granted and denied, in part, Appellees' motion by: denying Appellees' request to refund the $500,000.00 cash deposit in lieu of bond, without prejudice; awarding $300,000.00 in exemplary damages ($150,000.00 as to Stone/Hill and $150,000.00 as to Initial for Appellants' willful violations under PUTSA) to Appellees; awarding a total of $529,126.73 in attorneys' fees to Appellees; and molding the verdict to the correct total of $2,090,000.00.[20] In that same order, the court granted and denied, in part, Appellants' post-trial motion by: molding the verdict by awarding Stone and Hill an additional $174,306.00[21] in mandatory pre-judgment interest. The court denied all other requests for post-trial relief, including: (1) Appellees' request for return of cash paid in

---

[19] This order also states that it "contemporaneously entered a permanent injunction in Appellees' favor." Order, 12/13/22, at 1.

[20] The jury incorrectly calculated the total amount as $2,190.000.00. However, the court later corrected the total amount.

[21] Specifically, the court awarded an additional $59,964.60 to Stone and $114,341.40 to Hill in pre-judgment interest.

lieu of an injunctive bond; and (2) Appellants' motions (a) for JNOV, (b) for a new trial, (c) to dissolve the preliminary injunction "and for Ancillary Relief," and (d) for relief "pursuant to [the] Pennsylvania Constitution regarding the imposition of enhanced damages[.]" *Id.* at 4.[22]

On January 23, 2023, the court molded the verdict which included an award of $526,126.73 in attorneys' fees to Appellees under the PUTSA. **See** Order Molding Verdict, 1/20/23, at 6 n.3 ("This [figure] reflects legal fees awarded under [s]ection 5305 of [the] PUTSA[,] with $180,326.73 resulting from representation of Lystn by Wolf, Baldwin & Associate, P.C., and $345,800.00 resulting from representation by Sodomsky & Nigrini, LLC.").[23]

---

[22] On December 19, 2022, the trial court entered an amended order, the text of which is verbatim from its original December 13, 2022 order disposing of the parties' post-verdict motions. The only difference between the two orders appears to be a correction regarding the amount of pre-judgment interest awarded to Hill ($114,341.40 versus $114,341**5**.40). Thus, we treat that order as simply an action taken by the trial court "to . . . correct formal errors in papers relating to the matter[,]" that does not affect the instant appeal. Pa.R.A.P. 1701(b)(1); **Metropolitan Edison Co. v. Old Home Manor, Inc.**, 482 A.2d 1062, 1065 (Pa. Super. 1984). **See also Pellizzeri v. Bureau of Professional and Occupational Affairs**, 856 A.2d 297, 302 (Pa. Cmwlth. 2004) (examples of formal errors amenable to correction include technical, non-substantive amendments to order that have no effect on pending appeal and cannot prompt new appealable issue).

[23] Specifically, the court molded the verdict "in accordance and agreement with th[e trial c]ourt's amended [post-trial motion] order." Order Molding the Verdict, 1/23/23, at 1. **See Fish v. Gosnell**, 463 A.2d 1042, 1052 (Pa. Super. 1983) (formal errors amenable to correction involve acts that do not require exercise of discretion, such as molding a verdict to reflect delay damages under Pa.R.C.P. 238, or incorporating pre-judgment statutory or contractual interest to the verdict under Pa.R.A.P. 1701). The court molded the verdict as follows: (1) in the amount of $300,000.00 in favor of Lystn as against
*(Footnote Continued Next Page)*

Appellants filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellants raise the following issues for our consideration:

(1) Is evidence insufficient as a matter of law for misappropriation of trade secrets under [the PUTSA,] as to the verdict in favor of Lystn[,] and against [] Stone, [] Hill, and Initial[]?

(2) Did the trial court err in awarding exemplary damages under the [PUTSA] which were already imposed by the jury, and which were a jury question, in favor of Lystn [,] and against [] Stone, [] Hill, and Initial[]?

(3) Did the trial court err in granting a permanent injunction, including its scope, under [the] PUTSA in favor of [Appellees] and against [] Stone, [] Hill, and Initial, LLC?

(4) Did the trial court err in granting, and in determining the amount of [] attorneys' fees, expenses[,] and costs under [the] PUTSA in favor of [Appellees]?

Stone and Hill Brief, at 14-15; Initial Brief, at 14-15.[24] Stone and Hill present the following two additional issues on appeal:

_____

Initial; (2) in the amount of $300,000.00 in favor of Lystn as against Stone and Hill; (3) for legal fees in the amount of $526,126.73 in favor of Lystn as against Stone, Hill, and Initial; (4) in the amount of $1,900,000.00 in favor of Lystn as against Stone and Hill; (5) in the amount of $1,485,341.40 in favor of Hill as against Lystn; and (6) in the amount of $778,964.60 in favor of Stone as against Lystn. **See** Molded Verdict, 1/23/23, at 1-2.

[24] Appellants also raise the following issues on appeal:

Did the trial court err in refusing to dissolve the preliminary injunction, and in refusing to hold a hearing for damages against the bond, which preliminary injunction was awarded in favor of [Appellees] and against [Appellants]?

*(Footnote Continued Next Page)*

- 16 -

> (1) Should the judgment for damages and injunction, in favor of Lystn [] and against [] Stone and [] Hill[,] be reversed as to b[r]each of the [n]on[-]competition [c]lause in the Lystn, LLC Operating Agreement, and under any theory of breach of fiduciary duties, under the insufficiency of the evidence and where, as here, Appellants are the verdict[]winners on the questions of breach of the buyout obligations of the Appellees and breach of fiduciary duties?
>
> (2) Is evidence insufficient as a matter of law for intentional interference with contractual relations[,] as to the verdict in favor of Lystn [] and against [] Stone and []Hill, and should the verdict have been molded where Appellants are the verdict[]winner[s] on the essential element of "improper"?

Stone and Hill Brief, at 15.

Appellants first claim that there was insufficient evidence to support the PUTSA verdict finding Appellants misappropriated Appellees' pet food formulas where those formulas were never admitted as evidence at trial. In particular, Appellants allege that Appellees could not and did not prove, by a preponderance of the evidence, that they were entitled to damages under the PUTSA without producing the pet food formulas during discovery and showing the formulas to the jury.

The PUTSA defines "trade secret" as:

---

> Did the trial court waive Pa.R.A.P. 1925 through its own material noncompliance where, in violation of Pa.R.A.P. []1925(b), the trial court's order gave less than 21 days from its entry to file a Concise Statement and did not specify any place or address for service?

Appellants' Brief 15-16. However, we disposed of these same issues in Appellants' related appeals at 115 MDA 2023 & 428 MDA 2023. **See Stone, et al, v. Lystn, LLC, et al.**, 115 MDA 2023 & 428 MDA 2023, * -- (Pa. Super. 2025).

- 17 -

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique[,] or process that:

**(1)** Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

**(2)** Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[25]

12 Pa.C.S.A. § 5302. *See Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700, 706 (Pa. Super. 2005) ("[A] trade secret may consist of any **formula**, pattern, device[,] or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.") (citation omitted; emphasis added).

The trial court found that "the jury received sufficient evidence concerning the similarity/identicality of Answers[]' and Kure's products, the commonality between the individuals [who worked for both companies], [and the] processes, equipment, methods, and technology [used] to bring these products to market." Trial Court Opinion, 9/27/23, at 26. The jury specifically found that Appellees, doing business as Answers Pet Food, are the owners of a trade secret and that Appellants "misappropriated the specific trade secret,

---

[25] The Commentary to section 5302 states that "reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on [a] 'need to know basis,' and controlling plant access." 12 Pa.C.S.A. § 5302, Commentary. "On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection." *Id.*

[]Lystn's pet food formulas." Jury Verdict Slip, 8/25/22, at ¶¶ 1, 2(f). Moreover, the jury found that Lystn's pet food formulas should, individually, be considered a trade secret, that the formulas were secret at the time of the misappropriation, and that the misappropriated trade secret "had actual or potential economic value because they were secret." *Id.* at ¶¶ 2.1, 3-4.

To support the jury's finding that Appellants misappropriated Lystn's pet food formulas, the court heard extensive testimony about the proprietary processes Lystn used to formulate its raw, whey-fermented pet food products. In particular, Derrick Hill (Derrick), a founder of and former Chief Financial Officer for Lystn who had been a Lystn employee for 14 years at the time of the instant matter, testified that the processes used by Answers to make their pet food were "unique and proprietary." N.T Jury Trial, Vol. II of XI, 8/3/22, at 332. Hill testified that no one else in the industry, other than Kure (Initial's brand), was using the same proprietary processes developed by Lystn. *Id.* Specifically, Hill testified that, other than Answers, Kure was the only other pet food company that put its goat milk in cardboard cartons, that manufactured raw, fermented pet food, and that used Lystn's process of cold storing and blast freezing their pet food product. *Id.* at 341; *id.*, Vol. I of XI, 8/2/22, at 257. *See also id.*, at 245-54 (Hill testifying process of cold storing and blast freezing Answers' product, as well as amount of ingredients that go into Answers' goat milk, are proprietary and were stolen by Initial); *id.* at 254 (specific cultures and cardboard cartons Answers chose for product are part of confidential trade secret used by Kure); *id.* at 271 (Hill testifying it took

Kure only three months to "start selling product that mimicked and competed directly with Answers Pet Food that took us over ten years to [develop]").

Appellees also presented witnesses who testified that Lystn had developed food safety programs that "establish[es] the processing steps to make the product[.]" N.T. Jury Trial, 8/4/22, at 779. Timothy Ahern, a food safety consultant, testified that he was hired at Lystn in 2018 as an independent contractor "to make sure Lystn was in compliance through Answers Pet Food with federal regulations." *Id.* at 765. Ahern "evaluate[d] the [food product] processes, perform[ed] hazard analysis[, and] made sure there [were] corrective actions in place when [] critical [control point] limits [were] not met." *Id.* at 778. Ahern testified that all Lystn food safety plan documents for Answers Pet Food has a cover page indicating the plan contains "[c]onfidential commercial information" that includes trade secrets. *Id.* at 783. Significantly, Ahern testified that "[u]naimously" Lystn's food safety plans were "proprietary[,] a trade secret[, and] confidential." *Id.* at 795-96. *See also id.* at 851, 858 (Greg Siragua, an expert in microbiology and the composition of pet food, who was "intimately familiar with the processes used by Answers in making their pet food," testifying Answers' pet food "process from the beginning to the end [] is proprietary in nature"); *id.* at 859, 862 (Siragua testifying process of making Answers pet food is trade secret and Answers products are "proprietary, confidential [] trade secrets, and unique"); *id.* at 861 (Siragua testifying Kure brand products are "quite similar" to Answers' Pet Food).

Moreover, the trial court noted that

[t]he jury heard testimony from nearly a dozen lay and expert witnesses regarding the ingredients and composition of the various products manufactured by Answers[] and Kure, including competing testimony as to the substantial similarity of the beef, chicken, pork, kefir, [and] broth products. The jury received testimony from witnesses aligned with both Appellees and Appellants describing the characteristics distinguishing Answers[] from other pet food companies. Whey fermentation was one such characteristic that Appellees sought to protect and monetize. [**See, e.g.**, Lystn Ex[hibit]s 3, 4, 29, 42; **see also, e.g.**, N.T., 1305:21-25-1306:1]. The jury heard there were no other competitors to Answers[] with similar whey[-]fermented meat products until Kure began operations.

[] Stone discussed in detail product formulation in making meat products. She testified to the complexity of Answers['] products, and the high level of knowledge required to develop and refine processes in a way that resulted in a product that was both safe and fit for animal consumption. She admitted to developing these products through trial and error while associated with Answers[]. That said, she very clearly suggested to the jury that, because she developed it (together with Decedent [Hill]), it was theirs to exploit (along with, in her opinion, anyone else in the pet food industry). [**See, e.g.**, N.T. 1310:9-15].

Trial Court Supplemental Opinion, 9/27/23, at 23-24.

Although trade secrets are afforded protection under the law, "there is no absolute privilege or unconditional bar as to disclosure of such matters." **George v. Schirra**, 814 A.2d 202, 204 (Pa. Super. 2002) (citations omitted). Pennsylvania Rule of Civil Procedure 4012, which governs protective orders in discovery proceedings, provides as follows:

(a)  Upon motion by a party or by the person from whom discovery or deposition is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from unreasonable annoyance,

embarrassment, oppression, burden or expense, including one or more of the following:

*   *   *

(9) that a trade secret or other confidential research, development or commercial information shall not be disclosed or be disclosed only in a designated way.

Pa.R.C.P. 4012(a)(9). The questions of whether disclosure is to be allowed, if protection is to be afforded, and the form of such protection, are matters to be determined according to the discretion of the court. *George*, 814 A.2d at 204[.]

***Crum v. Bridgestone/Firestone N. Am. Tire, LLC***, 907 A.2d 578, 585-86 (Pa. Super. 2006) (headnotes omitted). In **Crum**, our Court adopted the federal system's approach to burden shifting in cases involving protecting the privacy of trade secrets. Specifically, our Court stated "if the party resisting discovery demonstrates that the item sought is a protected trade secret, then the party seeking discovery is to demonstrate that production of the trade secret is relevant and necessary, and that the necessity outweighs the harm of disclosure." *Id.* at 587.

Instantly, Appellees proved that their pet food formulas were protected trade secrets; thus, the burden shifted to Appellants to show that Appellees needed to produce the actual formulas at trial due to their relevance and necessity and that any claimed necessity did not outweigh the harm of disclosure. **Crum**, *supra*. Appellants failed to do so. Based on the credible testimony presented at trial, there was sufficient evidence to support the jury's determination that Appellants had misappropriated Appellees' pet food

formulas without the necessity of admitting the actual formulas at trial. Thus, we find no merit to Appellants' insufficiency claim.

Appellants next claim that the trial court erred in awarding Appellees exemplary damages under the PUTSA when the jury had already imposed punitive damages, resulting in a violation of the PUTSA statutory cap.

The PUTSA creates a statutory cause of action for injunctive relief, compensatory damages, and exemplary damages for the actual loss caused by misappropriation of trade secrets and the unjust enrichment caused by such misappropriation. *See* 12 Pa.C.S.A. §§ 5303-5305. *See id.* at 5304(a) ("[A] complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.");[26] *id.* at § 5304(b) ("If willful and malicious misappropriation exists, **the court** may award exemplary damages in an amount not exceeding twice any award made under subsection (a).") (emphasis added).

Here, the jury found that the misappropriated trade secret—Lystn's pet food formulas—"had actual or potential economic value" due to its secretive nature. The jury also found that Appellants' "misappropriation was willful or

---

[26] Under subsection 5304(a) of the PUTSA, "[i]n lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." *Id.*

malicious." Jury Verdict Slip (Trade Secrets Claims), 8/25/22, at ¶ 6. After answering these questions on the verdict slip, the jury then was asked to "state the amount of damages, if any, sustained by the Lystn companies as a result of the misappropriation." *Id.* at ¶ 7.[27] Accordingly, the jury determined that Appellees should be awarded a total of $300,000.00 in monetary or compensatory damages—$150,000.00 due to Stone and Hill's collective misappropriation and $150,000.00 due to Initial's misappropriation. *Id. See* 12 Pa.C.S.A. § 5304(a) (a complainant under PUTSA "is entitled to recover damages for misappropriation"); *id.* ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.").[28]

When reviewing an award of damages, we are mindful that:

---

[27] Question 7 on the jury verdict sheet reads, "**If you answered "Yes" to Question 6**, state the amount of damages, if any, sustained by the Lystn Companies as a result of the misappropriation." Jury Verdict Sheet, ¶ 7. We acknowledge that Question 7 may have been inartfully drafted. However, due to the fact that only **a court** can award exemplary damages under the PUTSA, *see* 12 Pa.C.S.A. § 5304(b), the jury clearly intended to award compensatory (general) damages for Appellees' PUTSA claims.

[28] When molding the verdict, the court awarded Appellees exemplary damages under the PUTSA based upon the jury's determination that Appellants' misappropriation was willful or malicious. *See id.* at 5304(b) ("If willful and malicious appropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)."). Because the trial court's exemplary damages award did not exceed twice the amount of PUTSA compensatory damages awarded by the jury, the court was statutorily compliant.

> The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.
>
> Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*J.J. DeLuca Co., Inc. v. Toll Naval Assocs.*, 56 A.3d 402, 417-18 (Pa. Super. 2012) (citation omitted). Accordingly, "[w]e review a challenge to the calculation of damages for [an] abuse of discretion." *Id.* at 417.

Appellants claim that the verdict slip "confused the jury into awarding punitive damages of $150,000[.00] against Initial, LLC[,] and against Stone and Hill, jointly and severally[,] where nothing in the record established these figures and the jury chose them for punitive purposes." Initial Brief, at 77.[29] Notably, immediately prior to charging the jury, the court asked the parties, "What do you feel about the verdict slip?" N.T. Jury Trial, 8/12/22, at 2315. Appellants did not object to the wording of any PUTSA claims questions, particularly question #7 (damages), on the jury verdict sheet. *See id.* at 2315-23. Thus, we conclude that Appellants have waived any claim regarding the wording of the PUTSA damages award, including the claim that the jury awarded exemplary damages that violated a statutory cap which "the trial

---

[29] "To conserve judicial resources," Stone and Hill "adopt by reference" this portion of Initial's appellate brief. Stone and Hill Brief, at 79.

court was obligated to rectify." Appellants' Brief, at 120. *See* Pa.R.A.P. 302(a).

Even if we did not find Appellants' claim regarding the PUTSA damages award waived for failure to object to the jury verdict slip, we would affirm on the merits. The trial judge gave the following instruction regarding damage awards under the PUTSA to the jury:

> Concerning trade secrets specifically, a plaintiff is entitled to recover damages for misappropriation of a trade secret. **Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation not included in computing the actual loss.**
>
> Instead of damages measured by any other methods, the damages caused by misappropriation of a trade secret may be measured by the imposition of liability for a reasonable loyalty for a misappropriator's unauthorized disclosure or use of a trade secret.

N.T. Jury Trial, 8/12/22, at 2345-46 (emphasis added).[30] The jury's collective $300,000.00 "Trade Secret Claims" damages award, stated in question 7 on the verdict sheet, represented recovery for Appellees' actual loss and/or Appellants' unjust enrichment as a result of their misappropriation of Lystn's pet food formulas—the basis of monetary damages under PUTSA. Thus, while the jury may have concluded that Appellants also acted willfully or maliciously,

---

[30] Notably, Appellants also did not object to the PUTSA damages charge at trial. *See* Pa.R.C.P. 227(b) ("Unless specially allowed by the court, all exceptions to the charge to the jury shall be taken before the jury retires."); *see also* Pa.R.A.P. 302(a).

that finding supports the trial court's subsequent award of exemplary damages. Accordingly, the jury's PUTSA damages award represented compensatory damages—the only type of damages that a jury may award under PUTSA. ***See*** 12 Pa.C.S.A. § 5304(a); ***but see id.*** at § 5304(b) ("If willful and malicious appropriation exists, **the court** may award exemplary damages in an amount not exceeding twice any award made under subsection (a).") (emphasis added).

Appellants next claim that the trial court erred in granting a "permanent, perpetual injunction against [them]" under the PUTSA, where the court placed no temporal limitations on the relief sought, the scope of the injunction exceeded the products identification, and where the injunctive relief "was granted in favor of the 'tag-along entities' having no standing to sue under PUTSA, i.e., [the Lystn-affiliated companies]." Stone and Hill Brief, at 76. Relatedly, Initial claims that the trial court committed an error of law by applying a preponderance of the evidence standard, rather than a clear and convincing standard, when issuing the permanent injunction. Initial Brief, at 126. Initial also argues that because there has never been any contractual duty of confidentiality or non-competition between it and the Lystn-affiliated companies, "[b]ased on the jury's special findings that Steven Fisher and Jesse Ervin King did not breach any obligation of confidentially by providing services or supplies to Initial, [Appellees could not enjoin them on that basis]." ***Id.*** at 125.

The grant or denial of a permanent injunction is a question of law. **Buffalo Township v. Jones**, 813 A.2d 659, 664 n.4 (Pa. 2002). When an appellate court reviews the grant of a permanent injunction, its scope of review is plenary. **Kuznik v. Westmoreland County Bd. of Comm'rs**, [] 902 A.2d 476, 489 (Pa. 2006).

> On appeal, our inquiry concerns whether the lower court's legal determination that the plaintiff established a clear right to relief, as a matter of law, was proper. Accordingly, our standard of review is *de novo*. **Seven Springs Farm, Inc. v. Croker**, [] 801 A.2d 1212, 1216 n.1 (Pa. 2002) (standard of review for questions of law is *de novo*). Moreover,
>
> > [t]o be entitled to a permanent injunction, a party must establish **a clear right to relief**, and must have no adequate remedy at law, i.e., damages will not compensate for the injury. **J. C. Ehrlich Co. v. Martin**, [] 979 A.2d 862, 864 (Pa. Super. 2009). Unlike a preliminary injunction, a permanent injunction does not require proof of immediate irreparable harm.

**Liberty Place Retail Assocs., L.P. v. Israelite Sch. of Universal Practical Knowledge, et al.**, 102 A.3d 501, 506 (Pa. Super. 2014) (emphasis added) (some citations omitted).

Moreover, the PUTSA also authorizes injunctive relief. **See** 12 Pa.C.S.A. § 5303(a). "The elements for a permanent injunction under PUTSA are: (i) the existence of a trade secret; (ii) the communication of the trade secret pursuant to a confidential relationship; (iii) the use or threatened use of the trade secret in violation of that confidence; and (iv) harm." **Harbor Compliance Corp. v Firstbase.io, Inc.**, 2025 U.S. Dist. LEXIS 19864, *12-*13 (E.D. Pa. 2025) (citation omitted). Finally, under subsection 5303(a), "an

injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would [be] derive[d] from the misappropriation." 53 Pa.C.S.A. § 5303(a).

First, Initial's assertion that the appropriate standard of proof for a permanent injunction to issue is "clear and convincing" is legally incorrect. As stated above, in order to be entitled to a permanent injunction, a party must establish "a clear right to relief," in addition to having no adequate remedy at law. *Id.* A clear right to relief is not synonymous with clear and convincing evidence; the former is an equitable remedy. *See Big Bass Lake Cmty. Ass'n v. Warren*, 950 A.3d 1137, 1144 (Pa. Cmwlth. 2008 ) (injunction is "extraordinary remedy that should be issued with caution and 'only where the rights and equity of the plaintiff are clear and free from doubt'," requiring, among other elements, "a clear right to relief"). Thus, this argument is meritless.

With regard to the issuance of the permanent injunction, we have already stated that the court's injunctive relief entered against Appellants conformed to the jury's verdict that found: (1) Appellees were the owners of a trade secret; (2) Stone, Hill, and Initial "misappropriated the specific trade secret, []Lystn's pet food formulas[;]" (3) Lystn's pet food formulas should, individually, be considered a trade secret; (4) Lystn's formulas were secret at the time of the misappropriation; and (5) the misappropriated trade secret "had actual or potential economic value because they were secret." Jury

Verdict Slip, 8/25/22, at ¶¶ 1, 2(f), 2.1, 3-4. Moreover, the court concluded that the parameters of the permanent injunction were "both a logical response to the jury's finding of misappropriation, and a measured, necessary restraint calculated to protect Appellees' trade secrets from further unlawful exploitation." Supplemental Trial Court Opinion, 9/27/23, at 42. Based on the evidence proving Appellees had a protectable trade secret that the Appellants misappropriated, and that the Appellants derived a commercial advantage from using Appellees' secreted pet food formulas, necessarily causing damage to Appellees, we find no error in the court's permanent injunction in order to protect Appellees' commercial interests. **See Harbor Compliance**, **supra** at *67 ("PUTSA states that 'an injunction shall be terminated when the trade secret has ceased to exist.'").

Next, Appellants assert that the trial court erred in granting attorneys' fees, expenses, and costs under the PUTSA.[31] Specifically, Appellants claim that Appellees did not present any information to substantiate the hourly rates, times, dates, or description of work performed by their attorneys and also did not differentiate between work performed on the PUTSA and non-

---

[31] We note that attorneys' fees and costs, as well as lost profits damages, may be awarded to the verdict winner under the PUTSA, even when exemplary damages have been awarded. **See Advanced Fluid Sys. V. Huber**, 958 F.3d 168 (3d Cir. 2020); **see also** 12 Pa.C.S.A. §§ 5305(1), (3) (PUTSA provides, in relevant part, that "[a] court may award reasonable attorney fees, expenses[,] and costs to the prevailing party: (1) if a claim of misappropriation is made in bad faith . . . or (3) willful and malicious misappropriation exists.").

PUTSA clams.  *See* Initial's Brief, at 78.  Because Appellants did not include this specific issue in their motion for post-trial relief, it is waived on appeal. *See* Pa.R.C.P. 227.1; ***Bensinger v. University of Pittsburgh Medical Center***, 98 A.3d 672, 682 (Pa. Super. 2014) (failure to raise issue in post-trial motion waives appellate review of claim).

Stone and Hill next claim that the trial court erred in awarding damages and granting an injunction against them as it relates to breach of the non-competition clause in the parties' agreement and under any theory of breach of fiduciary duties.  Specifically, Stone and Hill claim that there was insufficient evidence to sustain the damages and support the injunction where "[Stone and Hill] are the verdict-winners on the questions of breach of the buyout obligations of the Appellees and breach of fiduciary duties."  Stone and Hill Brief, at 15.

With regard to the award of damages and granting of a permanent injunction, we note that the jury determined:  (1) Stone and Hill were under a contractual duty not to compete with Appellees; (2) Stone and Hill breached their covenant not to compete with Appellees; (3) Fisher and King had a valid and enforceable agreement with Appellees; and (4) Stone and Hill intentionally interfered with Appellees' actual or prospective contractual relations with its employees, contractors, suppliers and/or distributors.  *See* Jury Verdict Slip, 8/25/22, at 2-4.  Based upon these findings, which were all predicated upon "**Non**-Trade Secret Claims," the jury awarded Appellees

$1,900,000.00 in compensatory damages against Stone and Hill, collectively. *Id.* at 4.

However, with regard to the PUTSA claims, the jury awarded Appellees $150,000.00 in monetary damages against Stone and Hill, collectively, *and* $150,000.00 against Initial. *Id.* at 2. These damages were based on the "Trade Secret [i.e., PUTSA] Claims" denoted in the verdict slip. Specifically, the jury found that Stone, Hill, and Initial misappropriated Lystn trade secrets and that the misappropriation was willful or malicious. *Id.* Thus, despite Initial's claim that it had no contractual duty of confidentiality or non-competition on civil common law claims (i.e., non-PUTSA claims), it was actually ordered to pay damages under the PUTSA.

Finally, although Stone and Hill were the verdict winners with regard to Lystn's breach of its contractual duty to buy their member interests and shares under the agreements, they were *not* the verdict winners under the PUTSA claims—the basis for issuing the permanent injunction and the award of monetary damages under subsection 5304(a)—or with regard to the contractual breach of confidential information and interference with actual or prospective contractual relations causes of action. Thus, this claim has no merit.

Stone and Hill also claim that they were not bound by any non-compete clauses in the parties' agreements because once Appellees materially breached their duty to buy out Stone's and Hill's member shares upon their resignation, Stone and Hill, as the non-breaching party, no longer had a

"continuing duty of performance" under the agreement. *See* Stone and Hill Brief, at 87-88. *See also LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.3d 639, 648 (Pa. 2009); *Oak Ridge Constr. Co. v. Tolley*, 504 A.2d 1343, 1348 (Pa. Super. 1985). We disagree.

Instantly, Stone and Hill gave notice of their intent to resign their positions on April 26, 2021, but had already been consulting for Initial prior to that date. Thus, despite Stone and Hill's argument that they dissociated with Lystn as of March 5, 2021, and that Lystn "had breached the buyout that clearly occurred [before] any competition by Stone and Hill [where] Kure Products [did not go] to market [until] September of 2021," the trial court found otherwise. Stone and Hill's Post-Trial Motion, 8/22/22, at 14. Specifically, the trial court determined that Stone and Hill's "idea for Kure's formation began *prior* to [] Hill and [] Stone's resignation as employees and officers [and that f]urther, evidence suggests . . . that [] Hill and [] Stone were involved in these discussions, and they even considered or at least discussed being owner members of Initial." Trial Court's Findings of Fact, Discussion, and Conclusions of Law in Support of Order Granting Special Injunctive Relief, 11/5/21, at 70-71. Moreover, the court found that "[s]ince the member owners of Initial met for the first time in early May [2021,] Hill and/or [] Stone have[:] (a) consulted for Initial (which competes directly with Answers[]) regarding operations and formulations[;] (b) induced key employees and consultants to cease their relationship with Answers[;] (c) induced suppliers unaffiliated with the member owners of Initial to supply for

- 33 -

Initial and cease operations with Answers[;] and (d) acted as the public-facing entrepreneurs behind Kure." *Id.* at 71. *See also* Trial Court Opinion, 2/8/22, at 26-27 ("[The t]rial Court specifically found that Ms. Stone and Ms. Hill began their endeavor to compete with Appellees (and take processes, customer information, pricing, and other commercially-sensitive information) *before* **they resigned from Appellees**.") (emphasis in original).

Because the evidence shows that Stone and Hill breached their duty to not compete *before* Lystn's obligation to buy out their member shares and interests arose, we find no merit to this argument. *LJL Transp., Inc.*, *supra*; *Oak Ridge Constr.*, *supra*.

Finally, Stone and Hill assert that there was insufficient evidence to support a verdict in favor of Appellees on the claim of intentional interference with contractual relations. Moreover, they argue that the verdict should have been molded to reflect that they were the verdict winners on that claim. *See* Stone and Hill Brief, at 15.

To prove that an individual has intentionally interfered with contractual relations, a plaintiff must show:

> [that the defendant has] intentionally and improperly interfere[d] with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract[. If that is proven, the defendant] is subject to liability to the [plaintiff] for the pecuniary loss resulting to the[m] from the failure of the third person to perform the contract.

Restatement (Second) of Torts, § 766 (1979); *see also Daniel Adams Assocs., Inc., v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa. Super.

1987). The Restatement also governs claims for intentional interference with *prospective* contractual relations. In order to state a claim, a plaintiff has the burden of pleading and proving:

> [o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> > (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> >
> > (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979); **see also Glenn v. Point Park College**, 272 A.2d 895, 897 (Pa. 1971).

Stone and Hill claim that there was insufficient evidence that they acted "improperly" with regard to proving that they intentionally interfered with Appellees' contractual relations, where the jury determined that Stone and Hill did not make "any untrue statements of fact or opinion that they knew would likely result in financial harm to [Appellees and] that [they] knew to be untrue or did not have a basis for knowledge or belief of its truth." Stone and Hill Brief, at 107; Jury Verdict Slip, 8/25/22, at ¶ 15.

In **Walnut St. Assoc. (WSA) v. Brokerage Concepts, Inc.**, 20 A.3d 468 (Pa. 2011), our Supreme Court affirmed the decision of this Court finding that truthful statements could not form the basis of a claim for tortious interference with contractual relations. **Id.** at 471. Relying on Restatement Section 772(a), the court noted that "one who intentionally causes a third

person not to perform a contract with another does not interfere improperly with the other's contractual relation by giving the third person truthful information." *Id.* Pointing out that its decision did not adopt an entirely new rule of law, the Supreme Court clarified that subsection 772(a) "merely explicates the longstanding, existing rule concerning improper interference; the specific application logically follows from the general principle and nature of the tort." *Id.* at 479.

In *Walnut Street*, Appellant WSA provided insurance brokerage services and assisted employers in obtaining health insurance for their employees. *Id.* at 470. WSA was the broker for health insurance provided to the employees of Procacci Brothers Sales Corporation (Procacci). *Id.* Appellee, Brokerage Concepts, Inc.'s (BCI) employee, Kimberly Macrone, intentionally gave information, albeit truthful, about WSA's compensation to Procacci, when Procacci was seeking to lower its employee health insurance costs. *Id.* at 478. As a result of being given this information, Procacci fired WSA as its insurance broker. *Id.* The jury found that BCI's interference was improper; however, the jury had only been instructed on section 767 and its attendant factors. The parties agreed that if the trial court had deemed section 772(a) applicable, BCI would have been entitled to judgment as a matter of law. *Id.* Thus, the Court held that "BCI's truthful statements to Procacci were not actionable in this claim for tortious interference." *Id.* at 480.

Here, the jury concluded that Stone and Hill intentionally interfered with **Lystn's** actual or prospective contractual relations, *see* Jury Verdict Slip, 8/25/22, at ¶16, but did not intentionally interfere with the **Lystn Companies'** actual or prospective contractual relations with any of its employees, contractors, or suppliers. *Id.* at ¶ 17. Relatedly, in question 15, the jury found that Stone and Hill did not make untrue statements of fact or opinion, that would result in financial harm to "any of the **Lystn Companies**." *Id.* at ¶ 15 (emphasis added). Thus, the jury's verdict reflected that Stone and Hill only gave truthful information to **Lystn Companies'** employees. The jury verdict did not find that Stone and Hill gave truthful information to **Lystn**. *Walnut St.*, *supra*. Therefore, we find no merit to this issue.

Judgment affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/07/2025

- 37 -